J-A10024-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                         :                PENNSYLVANIA
                                           :
                    v.                        :
                                           :
                                           :
HOWARD HARRINGTON                 :
                                           :
                    Appellant          :     No. 1239 EDA 2023

Appeal from the Judgment of Sentence Entered January 23, 2023
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0008853-2019

BEFORE:   PANELLA, P.J.E., BECK, J., and COLINS, J.[*]

MEMORANDUM BY BECK, J.:                 **FILED AUGUST 2, 2024**

Howard Harrington ("Harrington") appeals from the judgment of sentence imposed following his convictions in the Philadelphia County Court of Common Pleas ("trial court") of rape by forcible compulsion, involuntary deviate sexual intercourse ("IDSI") by forcible compulsion, unlawful contact with a minor, statutory sexual assault, aggravated indecent assault without consent, sexual assault, endangering the welfare of a child, corruption of minors, IDSI of a person less than sixteen years of age, aggravated indecent assault by forcible compulsion, aggravated indecent assault of a person less than sixteen years of age, indecent assault without consent, indecent assault

_____

[*] Retired Senior Judge assigned to the Superior Court.

of a person less than sixteen years of age, and terroristic threats.[1]  Harrington argues that the trial court abused its discretion by admitting evidence pursuant to Pa.R.E. 404(b), by denying his challenge to the weight of the evidence supporting his convictions, and by providing insufficient reasons on the record to support his sentence.  Because we conclude that the trial court did not abuse its discretion in any of these respects, we affirm.

The trial court summarized the factual history of this case as follows:

> At trial, the Commonwealth presented the testimony of the victim ("[Victim]"), [Victim's] sister, Philadelphia Police Officer Matthew Stahl, and Philadelphia Police Officer Jose Viera of the Special Victims Unit.  …
>
> Victim met Harrington for the first time when Victim was about 10 years old, which is when Harrington had begun having a relationship with Victim's mother.  Soon after, Victim, her two younger siblings, and her mother moved into Harrington's mother's house [("House One")].  Also living in [House One] at that time were Harrington, his mother, two of his siblings, and five of his nieces and nephews.  The house had four bedrooms, and Victim slept in one of the bedrooms with her siblings, her mother, and Harrington.  Harrington and Victim's mother slept on a mattress, while Victim and her siblings slept on the floor.
>
> Within a month or two after Victim moved with her family into [House One], Harrington began physically abusing Victim.  More specifically, Harrington hit Victim with extension cords, pulled her hair, choked her, pinched her, squeezed her, and stepped on her head with a boot on his foot while she was sleeping.  Harrington's physical abuse of Victim continued on a weekly basis.  Sometimes Harrington would stop the abuse only after Victim agreed to apologize to him or to refer to him as "the

_____

[1] 18 Pa.C.S. §§ 3121(a)(1), 3123(a)(1), 6318(a)(1), 3122.1(b), 3125(a)(1), 3124.1, 4304(a)(1), 6301(a)(1)(ii), 3123(a)(7), 3125(a)(2), 3125(a)(8), 3126(a)(1), 3126(a)(8), 2706(a)(1).

king." Victim's mother witnessed some of the abuse but did not attempt to stop it.

At age 14, Victim moved into [another house ("House Two")] together with her mother, her siblings and Harrington. By that time, Victim's mother and Harrington had become parents to two additional children. At that house, Victim shared an upstairs bedroom with one of her younger sisters.

After Victim turned 15, Harrington began sexually assaulting her. The first assault occurred late at night after Victim had returned home from her job working at a pizzeria. Upon her arrival home, Victim encountered Harrington, who was drunk. Harrington offered shots of alcohol to Victim, and they proceeded to drink shots together. They then went into the living room and sat on the couch together. Harrington began rubbing Victim, and at some point, Victim bumped into Harrington with her arm and realized that Harrington's penis was erect. Victim then asked Harrington about his penis. Soon after, Harrington began kissing Victim and briefly took his penis out of his pants. He then took Victim upstairs to her bedroom, locked her bedroom door, and began attempting to insert his penis into her vagina. Nobody else was in the bedroom at that time. Victim felt pain and began making a lot of noise. Harrington told her to be quiet and stopped trying to penetrate her vagina. He then grabbed Victim's head and put his penis into her mouth. He continued to move her head with his hands until he ejaculated into Victim's mouth. Harrington then left the room without saying anything.

The next morning, Harrington came into Victim's room and told her that they were going to get in trouble with Victim's mother for what had happened the prior evening. He said that they would have to tell Victim's mother about the incident, and that Victim's mother would be mad at both of them. He claimed to be scared that Victim's mother would kick Harrington out of the house and not let Harrington see his kids any longer. Victim became scared that Victim's mother would also kick her out of the house. Harrington told Victim that the only way to avoid telling Victim's mother about the incident would be for Victim to swear to take the secret to her grave. Victim agreed to do so.

One night later that week, after other members of the household had gone to bed, Harrington again attempted to put his penis inside Victim's vagina. Victim felt pain from Harrington's

attempts to penetrate her. Harrington stopped when he heard the footsteps of Victim's mother coming down the stairs. Harrington then pushed Victim aside and locked himself in a nearby bathroom. Victim heard Victim's mother questioning Harrington about what had been happening, and then Harrington and Victim's mother went upstairs. After some time, Victim's mother called Victim up to Victim's mother room. Victim's mother then started screaming at Victim and asking her about what had happened. Victim responded by screaming and crying and telling her mother that nothing had happened.

Harrington's sexual assaults of Victim continued to occur at [House Two] more than two to three times per week. All that Victim recalled about the first time that Harrington successfully penetrated her vagina is that there was blood. After that, Harrington would regularly penetrate Victim's vagina and mouth with his penis at night while everyone else in the house was sleeping. He sexually assaulted her in the bedroom, the living room, the bathroom, the dining room, and other places in the house where nobody else was present. On some occasions, Harrington touched Victim's vagina with his hands and his mouth. He also touched Victim's breasts and buttocks.

Harrington continued to subject Victim to physical abuse while he abused her sexually. More specifically, Harrington continued to hit, choke and slap Victim, pull her by the hair, and throw her from one side of the room to another by her hair. Victim recalled one occasion in which Harrington threw chairs around the room, broke a television, grabbed Victim, and then had sexual intercourse with her after physically abusing her. Victim never consented to any of the sexual activity with Harrington. After Victim turned 16 years old, Harrington began asking her to take nude photographs of herself so that he could use them to masturbate. Victim agreed to take the photographs and provided them to Harrington.

Harrington's physical abuse of Victim continued but became less frequent after he began sexually assaulting her. Harrington often told Victim that he would have to "be [her] dad again" if they "stopped doing sexual stuff." Victim interpreted that to mean that Harrington would subject Victim to greater levels of physical abuse if the sexual activities were to stop. At around age 16, Victim moved with her family to a house … in Philadelphia ("House Three"). In [House Three], Victim had her own bedroom on the

second floor. Harrington generally slept alone on a couch on the house's first floor. On one occasion, Harrington became angry with Victim because he learned that she liked a boy at her school. As a result, Harrington choked her, threw her to the ground, and tried to stomp on her as she was laying on the ground. Later, Harrington came into Victim's bedroom and said that Victim did not love him. Harrington then began trying to have sex with Victim, and when she kept refusing, Harrington forced himself on Victim. Harrington pulled down her pants and repeatedly tried to open her legs to put his mouth on Victim's vagina. He eventually succeeded in putting his mouth on Victim's vagina against her will.

Over time, Harrington sexually assaulted Victim in all of the different rooms in [House Three]. Harrington's sexual assaults on Victim continued until Victim was 20 years old. Harrington sexually assaulted Victim almost every week from the time Victim was 15 years old until the time Victim became 20 years old. None of the sexual assaults took place in the presence of another person. Victim never reported the sexual abuse during that time because she was scared of Harrington and frightened about what would happen to her and her family.

At age 20, Victim moved out of her family home and stopped living in the same house as Harrington. After living with Harrington's mother for a few months, Victim moved into a house with Victim's boyfriend. In September of 2019, one of Victim's little sisters sent a text message to Victim. The sister, who still lived in the family home with Harrington, stated in the message that she had begun feeling uncomfortable because Harrington had been getting drunk and "spooning" with her in her bed. Concerned that Harrington would begin sexually abusing Victim's sister, Victim took the sister out of Harrington's home and brought the sister to live with her.

After Victim took her sister out of Harrington's home, Harrington began sending threatening text messages to Victim through another family member's phone. Victim recognized that Harrington was the sender of the messages by the content of the messages and because the messages were signed, "58th Street," which is the city block where Harrington grew up. On September 15, 2019, in a text message to Victim, Harrington stated: ["]Yo bitch. If I ever see you or your pussy ass boyfriend again, I'mma … beat y'all the fuck up. You know who this is. Try me. 58th Street, Bitch.["]

On September 16, 2019, Victim called 911. She then traveled with her boyfriend and her sister to the Philadelphia Police Department and reported Harrington's physical and sexual abuse. Harrington's last act of sexual abuse against Victim had taken place approximately one year prior to Victim's disclosure of the abuse to the police in September of 2019.

On October 13, 2019, two police officers traveled to Harrington's house and arrested him. On that same date, Harrington provided biographical information to police, reporting in part that he was 38 years old, weighed 245 pounds, and was five feet and eight inches tall.

Trial Court Opinion, 8/11/2023, 2-7 (name substituted for party designation; citations to the record omitted).

Relevantly, the Commonwealth filed a pre-trial motion seeking to admit evidence of Harrington's past physical abuse of Victim pursuant to Pa.R.E. 404(b) and **Commonwealth v. Dillon**, 925 A.2d 131 (Pa. 2007).[2] The trial court granted the motion over Harrington's objection.

_____

[2] In **Dillon**, a minor failed to disclose sexual abuse by her mother's live-in partner until several years after the partner and her mother separated. **Dillon**, 925 A.2d at 133. The prosecution sought to introduce, in its case-in-chief, evidence of Dillon's past physical abuse of the victim's mother and brother under Rule 404(b), arguing that these prior bad acts showed that the victim delayed reporting the sexual abuse because she feared Dillon's retaliation. **Id.** at 139. Dillon's physical abuse of the victim's family members, our Supreme Court decided, "was relevant for purposes other than to show his bad character and criminal propensity." **Id.** at 139. In sexual assault prosecutions, the Court observed, juries may naturally be inclined to disbelieve a victim based upon long reporting delays without some other explanation for the delay. **Id.** That Dillon physically abused the victim's mother and brother was probative to explain the victim's "significant delay in reporting the alleged sexual assaults," which, in turn, allowed the factfinder "to more accurately assess the victim's credibility." **Id.** The Commonwealth
*(Footnote Continued Next Page)*

The case proceeded to a jury trial. Notably, the trial court instructed the jury that it could not consider the prior physical abuse for any reason other than Victim's explanation for delaying disclosure of the sexual abuse, including to show that Harrigton was a bad person or that he has criminal tendencies from which the jury may be inclined to infer guilt. **See** N.T., 10/6/2022, at 183-84. Ultimately, the jury found Harrington guilty of the aforementioned crimes. On January 23, 2023, the trial court imposed an aggregate sentence of fifteen to thirty years of incarceration, followed by five years of reporting probation. It also ordered Harrington to register as a Tier III offender under the Sexual Offender Registration and Notification Act ("SORNA"). Harrington filed a post-trial motion, which the trial court denied.

Harrington filed a timely notice of appeal. Both Harrigton and the trial court complied with Pa.R.A.P. 1925.

On appeal, Harrington presents three issues for our review:

I. Did the trial court commit reversible error by granting the Commonwealth's motion in limine and permitting the introduction of evidence of prior bad acts?

II. Did the trial court abuse its discretion by denying Harrington's post-sentence motion because the verdict was against the weight of the evidence?

---

could introduce such evidence during its case-in-chief, and so long as the trial court tailors "how and to what degree" it allows the evidence to be introduced such that the potential for prejudice does not outweigh the probative value of the evidence, the Court concluded that a defendant's prior bad acts are admissible to explain why a victim delayed reporting the abuse. **Id.** at 140-41.

III.     Did the trial court abuse its discretion when sentencing Harrington, where the court failed to state sufficient reasons on the record to support the above-guidelines sentence?

Harrington's Brief at 5 (suggested answers and titles omitted, issues reordered).

## **Prior Bad Acts**

In his first issue, Harrington argues that the trial court erred in admitting evidence of his prior physical abuse of Victim because, unlike **Dillon**, Victim in the instant case "never testified or suggested" that she delayed in reporting the allegations because she feared Harrington. **Id.** at 15. Harrington insists that Victim's own testimony established that she did not report the assaults because she feared that her mother would abandon her. **Id.** at 15-16. Further, Harrington argues, none of the Rule 404(b)(2) exceptions apply, and even if they did, unfair prejudice outweighed any probative value of the evidence. **Id.** at 16-20.

"The admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion." **Commonwealth v. Ganjeh**, 300 A.3d 1082 (Pa. Super. 2023). An abuse of discretion is more than a mere error in judgment. **Id.** Rather, the trial court abuses its discretion when it overrides or misapplies the law or exercises its judgment in a manner that is manifestly unreasonable or that reflects bias, prejudice, ill-will, or partiality. **Id.**

In general, "all relevant evidence, i.e., evidence which tends to make the existence or non-existence of a material fact more or less probable, is admissible." ***Dillon***, 925 A.3d at 136; ***see also*** Pa.R.E. 401, 402. Even if relevant, however, "[e]vidence of 'other crimes, wrongs, or other acts' is inadmissible solely to show a defendant's bad character or his propensity for committing criminal acts." ***Commonwealth v. Hairston***, 84 A.3d 657, 665 (Pa. 2014) (quoting Pa.R.E. 404(b)(1)). Nevertheless, Rule 404 authorizes the trial court to admit evidence of prior bad acts when such evidence is relevant for another purpose, such as "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake," provided that "the probative value of the evidence outweighs its potential for unfair prejudice." Pa.R.E. 404(b)(2). This list of other purposes is "non-exhaustive." Pa.R.E. 404(b) cmt.; ***see also, e.g., Commonwealth v. Ivy***, 146 A.3d 241, 251 (Pa. Super. 2016) ("An exception to Rule 404(b) exists that permits the admission of evidence where it became part of the history of the case and formed part of the natural development of facts").

Upon review, we conclude that the trial court did not abuse its discretion by finding that Harrington's past physical abuse was relevant to explain Victim's delay in reporting the sexual abuse pursuant to ***Dillon***. ***See*** Trial Court Opinion, 8/11/2023, at 17-18. Pertinently, Harrington's recounting of Victim's testimony in his argument omits the latter half of her response:

[Prosecutor:] Why is it that you didn't report these incidents when you were between the ages of 15 and 19?  Why is it that you waited?

[Victim:] I was scared.

[Prosecutor:] What were you scared of?

[Victim:] Everything.  What [Harrington] said the first day about my mom not wanting anything to do with us anymore, about if -- what would happen to me, what would happen to my family.  **I was scared of [Harrington], what he might do if I told someone, because he made me promise to take it to the grave.**

N.T., 10/5/2022, at 108 (emphasis added).  ***Accord id.*** at 97-98 (Victim's testimony that when she had sex with Harrington, he was "nicer to her" and did not physically abuse her as much, and that he told her that if they "stopped doing sexual stuff" he would have to "be [her] dad again" and physically abuse her the way that he did when she was younger); ***id.*** at 121 (Victim's testimony that she was still scared of Harrington when she moved out of the family home, but that she overcame her fear to report the abuse because of her concern that he would abuse her sister, who by then was a young teenager).

While fear of her mother's reaction certainly played a role in Victim's failure to report the abuse, ***see id.*** at 84, her response also supports the notion that she feared Harrington and his violent response if she told someone. Viewed in its entirety, Victim's testimony plainly supports the trial court's determination that the circumstances of this case were akin to ***Dillon*** and that the probative value of the prior physical abuse evidence outweighed any potential for unfair prejudice.  ***See Dillon***, 925 A.2d at 139.  Moreover, to

reduce the prejudicial impact, the trial court explicitly instructed the jury that it could not consider the physical abuse for non-permissible reasons.[3]  ***See*** N.T., 10/6/2022, at 183-84; ***see also*** Pa.R.E. 404(b) cmt. ("When weighing the potential for prejudice of evidence of other crimes, wrongs, or acts, the trial court may consider whether and how much such potential for prejudice can be reduced by cautionary instructions."); ***Dillon***, 925 A.2d at 141.  Thus, we discern no abuse of discretion in admission of the physical abuse to explain the delay in Victim's disclosure of the sexual assaults.  ***See Dillon***, 925 A.2d at 139.

## Weight of Evidence

In Harrington's second issue, he claims that the trial court abused its discretion in rejecting his challenge to the weight of the evidence because the "verdict shocks the conscience" as it was based upon Victim's "implausible testimony."  Harrington's Brief at 26.  Harrington argues that "no rational juror could credit the [Victim's] incredible testimony" that he abused her sexually and physically several times a week for years in houses that they shared with

---

[3] ***Dillon*** also permitted the prior bad acts to come in "for res gestae purposes, i.e., to explain the events surrounding the sexual assaults[] and resulting prosecution so that the case presented to the jury did not appear in a vacuum."  ***Dillon***, 925 A.2d at 139.  While such a reason also could be applicable here, the trial court instructed the jury not to consider the physical abuse evidence "in any other way other than for the purpose" of "providing an explanation for [Victim's] delayed disclosure of the alleged sexual abuse." N.T., 10/6/2023, at 183.

a multitude of other people, particularly because none of the people in the home testified to substantiate Victim's accusations. *Id.* at 26-27. Harrington further assails Victim's credibility by highlighting her years-long delay in reporting the abuse and claiming that she reported the abuse only days after she unsuccessfully "attempted to extort" Harrington by demanding that he turn over her younger sibling's child support money to avoid her accusations of abuse that would land him in prison. *Id.* at 27.

The following legal principles apply to a trial court's consideration of a challenge to the weight of the evidence supporting a conviction:

> An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. A trial judge must do more than reassess the credibility of the witnesses and allege that he would not have assented to the verdict if he were a juror. Trial judges, in reviewing a claim that the verdict is against the weight of the evidence do not sit as the thirteenth juror. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice. Thus, to allow an appellant to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the trial court.

*Commonwealth v. Juray*, 275 A.3d 1037, 1046-47 (Pa. Super. 2022) (quotation marks and citations omitted).

Our standard of review for weight of the evidence claims, however, differs from that of the trial court:

> Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict

- 12 -

is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Id.* at 1047 (citation omitted).

In contrast to Harrington's view that the weight of the evidence was contrary to the verdict, the trial court described the evidence as "compelling" and in full support of the verdict. Trial Court Opinion, 8/11/2023, at 16. Like the jury, the trial court found Victim's testimony to be credible regardless of contradictions as to minor details, and text messages sent by Harrington corroborated parts of Victim's testimony. *Id.* (citing N.T. 10/5/22 at 123-24, 157; Commonwealth Exhibit 14).

Here, we reject Harrington's request to reassess Victim's credibility. *See Juray*, 275 A.3d at 1046. Indeed, to the extent Harrington argues that Victim's testimony was not credible because other people lived in the home or because Victim did not report the abuse to police until after her attempted extortion of Harrington failed, defense counsel cross-examined Victim on these very topics and failed to persuade the jury that Victim was lying. Moreover, as to Victim's alleged inconsistencies, not only does Harrington fail to discuss or cite to the portions of Victim's testimony that he believes to be inconsistent, but the trial court found any inconsistencies to be minor and

within the jury's domain for assessment. Trial Court Opinion, 8/11/2023, at 16. Accordingly, the trial court did not abuse its discretion in rejecting Harrington's weight challenge, as the jury is "the sole arbiter of the credibility of each of the witnesses," and it "is entitled to resolve any inconsistencies in the Commonwealth's evidence in the manner that it sees fit." ***See Commonwealth v. Jacoby***, 170 A.3d 1065, 1080 (Pa. 2017).

## Discretionary Aspects of Sentence

Harrington's final claim raises a challenge to the discretionary aspects of his sentence.

> The right to appellate review of the discretionary aspects of a sentence is not absolute and must be considered a petition for permission to appeal. To invoke this Court's jurisdiction to review a challenge to the discretionary aspects of a sentence, an appellant must satisfy a four-part test:
>
> > (1) the appellant preserved the issue either by raising it at the time of sentencing or in a post-sentence motion; (2) the appellant filed a timely notice of appeal; (3) the appellant set forth a concise statement of reasons relied upon for the allowance of his appeal pursuant to Pa.R.A.P. 2119(f); and (4) the appellant raises a substantial question for our review.

***Commonwealth v. Rivera***, 312 A.3d 366, 376-77 (Pa. Super. 2024) (citations, brackets, and quotation marks omitted).

Harrington timely filed a notice of appeal, preserved the issue in both a post-sentence motion and at his sentencing hearing, and included a Pa.R.A.P. 2119(f) statement in his brief. In his Rule 2119(f) statement, Harrington requests that this Court review his sentence because the trial court failed to

state reasons on the record to support the imposition of a sentence outside the sentencing guidelines, which presents a substantial question. **See Commonwealth v. Rodda**, 723 A.2d 212, 214 (Pa. Super. 1999) (en banc). Accordingly, we will proceed to review this challenge to his sentence, mindful of the following:

> Our well-settled standard of review concerning the discretionary aspects of sentencing is as follows: Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

**Commonwealth v. Bullock**, 170 A.3d 1109, 1123 (Pa. Super. 2017) (citations, quotation marks omitted).

Sentencing in Pennsylvania is individualized and requires the trial court to fashion a sentence "that is consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant[.]" 42 Pa.C.S. § 9721(b). The trial court must also consider the sentencing guidelines adopted by the Pennsylvania Commission on Sentencing. **Id.** "Where the court has the benefit of a [presentence investigation] report, we presume the court was aware of all appropriate sentencing factors and considerations and consider the requirement that the court place its reasoning on the record to

- 15 -

be satisfied." ***Commonwealth v. Snyder***, 289 A.3d 1121, 1126 (Pa. Super. 2023).

Harrington argues that the trial court failed to state sufficient reasons to support its imposition of "statutory maximum sentences" outside the sentencing guidelines[4] because it "made only boilerplate references" to the section 9721(b) factors without explaining how the sentence imposed related to the factors. Harrington's Brief at 25. Upon review, we conclude that Harrington's description of the trial court's explanation is incongruent with the record.

At the sentencing hearing, the trial court noted that it "considered all of the information in the presentence report, the investigation of prior record score, the mental health evaluation, [and] the report from the Sex Offender Assessment Board." N.T., 1/23/2023, at 30. The trial court stated that it had "considered all of the mitigating and aggravating evidence" and highlighted the most pertinent considerations. ***Id.*** at 30-31. The trial court noted that it considered Harrington's family support, character letters, his care of family members, his employment history, and his minimal criminal history as an adult. ***Id.*** at 31-32. Nevertheless, the court found that the aggravating factors in the case were "quite weighty" and "substantially outweigh[ed]" the

---

[4] Nowhere in his brief does Harrington specify what the guidelines were for the many crimes of which he was convicted. Because Harrington is not more specific, and based upon our resolution of his claim, we will assume for the sake of his argument that his sentence was indeed outside the guidelines.

mitigating evidence. *Id.* at 32. Specifically, the court determined that there was a "substantial need to protect others in this case" because Harrington "poses a danger to others, especially those who are vulnerable, including children." *Id.* at 32-33. While Harrington's prior record score was zero, he had been adjudicated delinquent of a violent offense at age seventeen. *Id.* at 31, 33. The court emphasized that Harrington physically abused his stepdaughter starting when she was age ten and raped and sexually assaulted her almost every week from the ages of fifteen to twenty. *Id.* at 34. It found that the "constant and repeated abuse" rendered Harrington's "far more serious … than a typical case of this nature." *Id.* Harrington abused "a position of trust" and "manipulated [Victim] into keeping the abuse a secret." *Id.* at 33-34. Harrington denied the conduct and expressed no remorse, demonstrating that he "does not seem ready to begin the rehabilitation process," leading the court to conclude that there was "an undue risk that [Harrington] would commit another crime while on probation or partial confinement." *Id.* at 34-35. Accordingly, the trial court imposed a total sentence of fifteen to thirty years of incarceration, followed by five years of reporting probation. *Id.* at 36.

Because the record belies Harrington's claim that the trial court did not provide sufficient reasons on the record to impose his sentence, no relief is due to Harrington. We therefore affirm his judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 8/2/2024